UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DUKES BRIDGE LLC,

                            Plaintiff,

      - against -

SECURITY LIFE OF DENVER INSURANCE
COMPANY,

      Defendant-Counterclaim Plaintiff,

      - against -

DUKES BRIDGE LLC, RCX I LLC, et al.,

      Counterclaim Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**

10-CV-5491 (ILG) (RML)

GLASSER, Senior United States District Judge:

Plaintiff Dukes Bridge LLC ("Dukes Bridge") brings this action against Security Life of Denver Insurance Company ("SLD") to obtain payment of death benefits on a life insurance policy that SLD issued. SLD raises an affirmative defense of fraud and asserts counterclaims against Dukes Bridge and numerous other individuals and entities, including Central Strategies, LLC ("CS"), Moshe Schreiber, and Grecia Scibilia (together, the "CS counterclaim defendants"). SLD alleges that Dukes Bridge and the other counterclaim defendants are endeavoring to defraud SLD as part of a "stranger-originated life insurance," or "STOLI," scheme, in which persons with no insurable interest in an individual's life illegally obtain an interest in a life insurance policy on that individual, essentially betting on his or her demise. See AEI Life, LLC v. Lincoln Benefit Life Co., 305 F.R.D. 37, 41 (E.D.N.Y. 2015) (quoting Lincoln Nat'l Life Ins. Co. v. Schwarz, No. 09-CV-3361, 2010 WL 3283550, at *1 (D.N.J. Aug. 18, 2010), for a detailed description of a "typical STOLI transaction"). Pending before the Court is the CS

1

counterclaim defendants' motion to dismiss SLD's counterclaims against them for failure to state a claim. For the following reasons, that motion is GRANTED solely to the extent that Counterclaim Counts III and IV are dismissed as against the CS counterclaim defendants, and otherwise DENIED.

## BACKGROUND

Except where otherwise noted, the following facts are taken from the Second Amended Counterclaim (Dkt. No. 109) and are accepted as true for the purpose of deciding this motion. Because SLD makes extensive allegations regarding the conduct of multiple parties, the Court's recitation of the facts here is limited to those that concern the claims against the CS counterclaim defendants. SLD is a Colorado company that underwrites life insurance policies, including those for ING Life Companies ("ING"). CS is a New York company that markets and sells life insurance policies on the secondary market. At all times relevant to this litigation, Schreiber was an insurance broker and owner of CS. Scibilia was a CS employee. SLD asserts, and the CS counterclaim defendants do not dispute, that this court has jurisdiction over the counterclaims pursuant to 28 U.S.C. § 1332(a)(1), and that venue is proper.

In the fall of 2007, CS entered into a series of agreements with Joseph Rubin, another insurance broker and proprietor of his own company, Joseph Rubin Inc., by which they planned to share between them commissions to be earned on life insurance policies they procured for a man named Eugene Mermelstein. Rubin and the CS counterclaim defendants approached the Bollinger Group ("Bollinger"), an agency that facilitates communication between brokers and insurance companies, in early September of 2007 to discuss obtaining policies on Mermelstein's life. On September 15, 2007, Bollinger submitted a preliminary inquiry to ING, and ING responded that it

2

would be willing to consider issuing a policy on his life, subject to the submission of a formal application that met all underwriting requirements.

In October of 2007, a number of trusts were created by Mermelstein, naming Mermelstein as the grantor and various members of his family as trustees. One of these trusts, the E. Mermelstein Irr Trust A ("Trust A"), named Mermelstein's daughter, Esther Fried, as both its sole trustee and beneficiary. On or about October 23, 2007, Mermelstein and Fried signed an application for a $10,000,000.00 life insurance policy from ING to be underwritten by SLD (the "Policy"). The application named Mermelstein as the proposed life to be insured, Trust A as the beneficiary, and New Jersey as the state from which the application originated and insurance would issue. In support of that application, Mermelstein and Fried affirmed that Mermelstein's total net worth was $20,000,000.00 and that his annual personal income was $1,300,000.00. Rubin completed a portion of the application, indicating that he was Mermelstein's insurance agent, and that, to his knowledge, Trust A did not intend to transfer ownership of the Policy or seek financing for its premiums. Rubin's office forwarded Rubin's portion of the application to Scibilia, who directed Rubin to leave blank a question which asked whether Mermelstein was applying for other life insurance policies, which Rubin did. Scibilia then forwarded the signed application to Bollinger, who in turn forwarded it to SLD.

SLD asked for further details about Mermelstein, including information about other insurance he carried (if any) and confirmation of the health and financial information contained in his application. After receiving this request, Rubin and the CS counterclaim defendants directed Jewel Strader, a co-counterclaim-defendant based in Texas, to prepare an "Inspection Report" that purported to contain the requested

3

information.  The Inspection Report provided independent third-party verification of Mermelstein's health and income.  It noted, among other things, that Mermelstein had no other insurance in force, and that Mermelstein's accountant had stated that Mermelstein's annual income was over $1,000,000.00 and his total net worth was approximately $30,000,000.00.  The CS counterclaim defendants and Rubin also told Bollinger that while Mermelstein was applying to two other insurers for coverage, he would only accept the carrier who made the best offer.

In January of 2008, relying on the above submissions, SLD approved Mermelstein's application and issued the $10,000,000.00 Policy, which required an initial premium of $872,300.00.  That premium was paid by check and wire transfer.  The submissions SLD relied upon in approving the application, however, were fraudulent.  Mermelstein's income was not over $1,000,000.00 a year, his net worth was not $20,000,000.00 or more, the accountant and other companies referenced in the Inspection Report were fictitious, outside financing had been secured to pay the Policy's premiums, Fried (on behalf of Trust A) had always intended to transfer the Policy to others, and Rubin and the CS counterclaim defendants had obtained or were in the process of obtaining similar life insurance policies on Mermelstein from other companies.  Schreiber was paid $252,967.00 of the $305,305.00 commission that Bollinger received from SLD for obtaining the Policy.  Had SLD known of the deception described above, it would not have issued the Policy.

A complex web of shell trusts and financing organizations making loans to one another paid the premiums on the Policy, but SLD claims the party responsible for making these payments was Dukes Bridge, the plaintiff in this action.  After Mermelstein died in 2009, Dukes Bridge, which had become the ultimate owner of the

4

Policy by virtue of a chain of reassignments, requested the Policy's proceeds. SLD refused to pay, prompting Dukes Bridge to file this suit on November 29, 2010. See Compl. (Dkt. No. 1). SLD filed its first answer and counterclaim on January 21, 2011 (Dkt. No. 9). Discovery, motion practice, and mediation ensued. SLD filed its Fourth Amended Answer and Second Amended Counterclaim on August 18, 2014. The CS counterclaim defendants filed this motion on November 7, 2014 (Dkt. No. 146), SLD opposed the motion on December 15, 2014 (Dkt. No. 151), and the CS counterclaim defendants replied on January 21, 2015 (Dkt. No. 156). Oral argument was heard on June 8, 2015.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint (or, in this case, counterclaim) must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Although detailed factual allegations are not necessary, mere legal conclusions, "a formulaic recitation of the elements of a cause of action," or "naked assertions" by the counterclaim plaintiff will not suffice. Id. (internal quotation marks and citations omitted). The Court must accept as true all factual allegations and draw all reasonable inferences in the counterclaim plaintiff's favor. Matson v. Bd. of Educ. of the City Sch. Dist. of N.Y., 631 F.3d 57, 63 (2d Cir. 2011).

Additionally, when a party alleges fraud or mistake, it must "state with particularity the circumstances constituting [such] fraud or mistake" in its pleading. Fed. R. Civ. P. 9(b). To satisfy this particularity requirement, a pleading must "'adequately specify the statements it claims were false or misleading, give particulars as

to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106, 119 (2d Cir. 2013) (quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)). Rule 9(b), however, does not replace Rule 8(a)(2), "which requires only a 'short and plain statement' of the claims for relief." Ouaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir. 1990). Thus, a claim of fraud satisfies the Federal Rules if it plausibly and succinctly alleges "'the who, what, when, where, and how'" of the fraud. See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).

## DISCUSSION

### I. Failure to State a Claim Under Rule 8(a)(2)

Count I of the Second Amended Counterclaim, which seeks rescission of the Policy on grounds of fraud, is not asserted against the CS counterclaim defendants. Count II is a common law claim for fraud. Count III pleads knowing or negligent material misrepresentations of fact. Count IV alleges that the counterclaim defendants "lack[ed] [an] insurable interest" in Mermelstein's life. Count V alleges violations of the New Jersey Insurance Fraud Prevention Act ("NJIFPA"), N.J. Stat. Ann. § 17:33A-1, et seq., which prohibits, inter alia, making a false or misleading statement to an insurance company about any material element of an insurance application. Count VI alleges that the counterclaim defendants participated in a civil conspiracy to secure the Policy. SLD argues that New Jersey law applies to all of its claims because the Policy includes a New Jersey choice-of-law provision. The CS counterclaim defendants allege that New York

6

law, not New Jersey law, applies, and that, regardless of which law applies, Counts II through VI do not state claims for relief. The Court addresses each argument in turn.

### A. Choice of Law

"A federal court, sitting in diversity, must look to the choice-of-law rules of the state in which it sits—here New York—to resolve conflict-of-law questions." AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 269-70 (2d Cir. 1992) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). A rider attached to the Policy contains a New Jersey choice-of-law clause, and such clauses "are entitled to a presumption of enforceability" in New York. Aguas Lenders Grp. v. Suez, S.A., 585 F.3d 696, 800 (2d Cir. 2009). The CS counterclaim defendants assert that they did not sign the Policy and are therefore not bound by its choice-of-law provisions. Furthermore, they argue, even if they had signed the Policy, it merely states that New Jersey law will govern "all legal rights and obligations under the contract applied for" (Dkt. No. 9-2 at 13 (emphasis added)) and "'under New York law, a contractual choice-of-law provision governs only a cause of action sounding in contract, not one sounding in tort,' unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties." H.S.W. Enters., Inc. v. Woo Lae Oak, Inc., 171 F. Supp. 2d 135, 141 n.5 (S.D.N.Y. 2001) (quoting Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1540 (2d Cir. 1997) (alteration omitted)).

At this juncture, the CS counterclaim defendants are estopped from arguing that they cannot be bound to the Policy's choice-of-law clause by virtue of the fact that they did not sign the Policy because SLD alleges that they derived a direct benefit from it. See Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Am. Boat Co., LLC, No. 11 Civ. 6804, 2012 WL 527209, at *4 (S.D.N.Y. Feb. 17, 2012) (collecting cases). They are

7

nevertheless correct that the Policy's choice-of-law provision is insufficiently broad to encompass non-contractual claims. Although it "makes reference to the law governing the rights [and obligations] of the parties, this phrase plainly refers to the parties' rights under the [contract] and not to their rights in all contexts." Refco Grp. Ltd. v. Cantor Fitzgerald, L.P., No. 13 Civ. 1654, 2014 WL 2610608, at *41 (S.D.N.Y. June 10, 2014) (internal quotation marks and brackets omitted). The Court must therefore conduct a choice-of-law analysis to determine what law to apply in evaluating SLD's counterclaims.[1]

"Under New York choice-of-law rules, '[t]he first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012) (per curiam) (quoting, inter alia, In re Allstate Ins. Co., 81 N.Y.2d 219, 223 (1993)). Counts III (misrepresentation) and IV (lack of insurable interest) must be dismissed regardless of the law applied, for reasons set forth infra. This leaves Count II, which alleges fraud, Count V, which alleges violation of a New Jersey insurance fraud statute with no applicable New York analogue, and Count VI, which alleges civil conspiracy to commit certain actions that are tortious solely under New Jersey law, as the sources of conflict regarding which state's law applies to this action.[2]

When resolving conflicts of law over tort claims, New York courts conduct an "interest analysis," which is "a 'flexible approach intended to give controlling effect to

---

[1] The Court is aware of its prior holding that the Policy's choice-of-law provision mandated applying New Jersey law to SLD's NJIFPA counterclaim against Dukes Bridge (Dkt. No. 69, reported at 2013 WL 432894 (Feb. 4, 2013)). With the benefit of additional briefing, the Court reaches the same result here using a different rationale.

[2] In New York, it was lawful to buy life insurance for one's self with the intent to transfer it to an entity that had no interest in the insured's life until May 18, 2010, long after the Policy was purchased in this case. See Kramer v. Phoenix Life Ins. Co., 15 N.Y.3d 539, 548 n.5 (2010) (citing N.Y. Ins. Law § 7815).

the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'" Finance One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 337 (2d Cir. 2005) (quoting Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 72 (1993)). Where, as here,

> the conflicting rules involve the appropriate standards of conduct . . . the law of the place of the tort 'will usually have a predominant, if not exclusive, concern' . . . because [of] the locus jurisdiction's interests in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future . . . .

Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 198 (1985) (quoting Babcock v. Jackson, 12 N.Y.2d 473, 483 (1963)).

The CS counterclaim defendants argue that New York law should govern this dispute because the alleged actions they took to orchestrate the sale of the Policy occurred in New York, where Mermelstein lived. SLD, however, correctly points out that a rider attached to the Policy states that "[a]ll communications, solicitation, and negotiation [for its] application occurred in the Application State [i.e., New Jersey]," and that the application states it was "signed by the owner/applicant and the agent in the Application State." See Dkt. No. 9-2 at 13. In similar circumstances, New York's Court of Appeals has found that the fraud took place in the state where the insurance policy was purchased, "not in New York, where [the] alleged fraudulent scheme was designed." In re Grand Theft Auto Video Game Consumer Litig., 251 F.R.D. 139, 149 (S.D.N.Y. 2008) (citing Goshen v. Mut. Life Ins. Co., 98 N.Y.2d 314, 325-26 (2002)). Since "[s]tates have a strong interest in protecting consumers with respect to sales

9

within their borders," the Court will apply New Jersey law to SLD's counterclaims. See id. (internal quotation marks and citation omitted).

## B. Fraud (Count II)

To state a claim for common law fraud in New Jersey, plaintiffs must allege (1) a material misrepresentation of a presently existing or past fact, (2) the defendant's knowledge or belief of its falsity, (3) an intention that the recipient of the misrepresentation will rely on it, (4) reasonable reliance thereon by that recipient, and (5) resulting damages. Gennari v. Weichert Co. Realtors, 691 A.2d 350, 367 (N.J. 1997) (citing Jewish Ctr. of Sussex Cnty. v. Whale, 432 A.2d 521, 524 (N.J. 1981)). SLD has plausibly alleged that the CS counterclaim defendants knowingly provided false information with the intention that SLD would rely on it in issuing the Policy, thereby satisfying all five elements of the cause of action.[3] The CS counterclaim defendants' assertions that they cannot be found liable for this fraud because they were not the actual signatories to the documents containing the fraudulent information are unavailing. "A plaintiff need not hear the misrepresentation from the defendant directly for there to be actionable fraud: '[W]here false representations are made to one person with the intent that they be communicated to others for the purpose of inducing the others to rely upon them, they may form the basis of an action for fraud by those others.'" Port Liberte Homeowners Ass'n, Inc. v. Sordoni Constr. Co., 924 A.2d 592, 601 (N.J. Super. Ct. App. Div. 2007) (quoting Metric Inv., Inc. v. Patterson, 244 A.2d 311, 314 (N.J. Super. Ct. App. Div. 1968) (alteration per Port Liberte)).

---

[3] As discussed infra, SLD has made these allegations with the specificity that Rule 9(b) requires.

### C. Material Misrepresentation (Count III)

To the extent that Count III alleges a "knowing" material misrepresentation of fact, it is duplicative of Count II. See Konover Constr. Corp. v. E. Coast Constr. Servs. Corp., 420 F. Supp. 2d 366, 370 (D.N.J. 2006) (describing the elements of intentional misrepresentation as identical to those of common law fraud). As for negligent material misrepresentation, there is no indication anywhere in the Second Amended Counterclaim that SLD might view the CS counterclaim defendants as negligent. Instead, it describes them, along with the other counterclaim defendants, as "intending from the inception" of their "scheme" to profit from insuring a life in which they had no insurable interest while "work[ing] to conceal . . . facts from [SLD] in order to promote and perpetuate their fraud." See, e.g., 2d Am. Countercl. ¶¶ 114-15, 169. Since there are no facts pleaded that even remotely support a claim for negligence, the motion to dismiss Count III as against the CS counterclaim defendants is granted.

### D. Lack of Insurable Interest (Count IV)

At oral argument on this motion, SLD agreed to discontinue pursuing Count IV as against the CS counterclaim defendants, and it is dismissed accordingly.

### E. NJIFPA (Count V)

Since SLD's common law fraud claim survives the motion to dismiss, its claim under the NJIFPA also survives "because this type of claim requires much less thorough pleading." Schwarz, 2010 WL 3283550, at *16. A plaintiff may state an NJIFPA claim merely by alleging that a defendant knowingly made a material misrepresentation of fact—the statute "does not require proof of reliance on the false statement or resultant damages, . . . [or] proof of intent to deceive." See id. (citations omitted); Liberty Mut. Ins. Co. v. Land, 892 A.2d 1240, 1247 (N.J. 2006) (noting that "the Act requires

11

plaintiffs alleging [NJ]IFPA violations to prove fewer elements than required for common law fraud").

### F. Civil Conspiracy (Count VI)

"In New Jersey, a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" Banco Popular N.A. v. Gandi, 876 A.2d 253, 263 (N.J. 2005) (quoting Morgan v. Union Cnty. Bd. of Chosen Freeholders, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993)). SLD has plainly alleged that the CS counterclaim defendants conspired with Rubin to defraud the insurer. The motion to dismiss is therefore denied as to Count VI.

## II. Failure to Satisfy Rule 9(b)'s Heightened Pleading Standard

All remaining counts of the Second Amended Counterclaim allege fraud, thereby triggering the "particularity" requirement of Rule 9(b). Additionally, Counts II and VI allege intent to defraud, and while Rule 9(b) notes that intent may be averred generally in a complaint, "plaintiffs are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990) (quoting Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987)).

The CS counterclaim defendants argue that the remaining counts fail to meet the above requirements because (1) their underlying factual allegations are based largely upon information and belief, (2) the facts pleaded do not give rise to a strong inference of fraudulent intent, and (3) the allegations fail to specify which counterclaim defendant

12

was responsible for each individual alleged misrepresentation. These arguments are meritless, for the reasons set forth below.

### A. Allegations Based Upon Information and Belief

Ordinarily, "Rule 9(b) pleadings cannot be based upon information and belief." DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987). "[W]here, as here, [however,] much of the factual information needed to fill out plaintiff's complaint lies peculiarly within the opposing parties' knowledge, the general rule disfavoring allegations founded upon belief ought not to be rigidly enforced." Id. at 1248. The Second Amended Counterclaim sets forth specific factual allegations, such as the CS counterclaim defendants' misleading communications with Bollinger (2d Am. Countercl. ¶ 156), the fraudulent contents of the insurance application and Inspection Report (id. ¶¶ 169, 193-99), and the commission payments made to and from the CS counterclaim defendants after the sale of the Policy (id. ¶¶ 217-18), and plausibly extrapolates from those allegations the details of the counterclaim defendants' multi-part scheme to reap the rewards from fraudulently-obtained life insurance. In other words, there are sufficient facts alleged to support SLD's assertions made upon information and belief in its Second Amended Counterclaim, especially since the workings of the alleged scheme are known particularly by the counterclaim defendants.

### B. Inference of Fraudulent Intent

A strong inference of fraudulent intent may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). In this case, to fail to draw if not conclude the inference of intent to defraud would be to

pretend that the sequence of false representations alleged were imagined and never made, or made in jest. The motion to dismiss Counts II and VI on grounds that such allegations were insufficient to satisfy Rule 9(b) is therefore denied.

### C. Blanket Allegations Against all Counterclaim Defendants

Finally, the CS counterclaim defendants claim that the language in the counts themselves violates Rule 9(b) because it does not describe which counterclaim defendants are responsible for which allegedly unlawful actions. The pleading as a whole, however, describes each counterclaim defendant's distinct role in the STOLI scheme: the CS counterclaim defendants coordinated with Rubin to effectuate the sale of the Policy, Strader drafted the fraudulent Inspection Report, Fried co-signed the Policy with her father for Trust A before leaving the trust in the hands of strangers, and Dukes Bridge and its affiliates ultimately attempted to claim the benefits. In other words, while the various counterclaim defendants played different parts in the scheme, all of them committed fraud. One of the central purposes of Rule 9(b) is to "provide a defendant with fair notice of a plaintiff's claim," and that notice need not take any specific form so long as it is sufficiently particularized. See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995) (internal quotation marks and citations omitted). Since SLD's detailed Second Amended Counterclaim provides such notice, the CS counterclaim defendants' motion to dismiss it on Rule 9(b) grounds is denied.

## CONCLUSION

For the foregoing reasons, the CS counterclaim defendants' motion to dismiss the Second Amended Counterclaim as against them is GRANTED solely as to Counts III and IV and otherwise DENIED.

SO ORDERED.

Dated: Brooklyn, New York
June 15, 2015

/s/
I. Leo Glasser
Senior United States District Judge