UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
DUKES BRIDGE, LLC,

    Plaintiff/Counterclaim Defendant,

        -against-

SECURITY LIFE OF DENVER INSURANCE
COMPANY,

    Defendant/Counterclaim Plaintiff,

        -against-

DUKES BRIDGE, LLC, RCX I LLC, THE E.
MERMELSTEIN IRR TRUST A designating
Esther Fried as beneficiary, THE E.
MERMELSTEIN IRR TRUST A designating Ariel
Yabra as beneficiary, ESTHER FRIED
individually and as the Former Trustee or
purported Co-Trustee of THE E. MERMELSTEIN
IRR TRUST A designating Esther Fried as
beneficiary and THE E. MERMELSTEIN IRR
TRUST A designating Ariel Yabra as beneficiary,
STAN MILLER, individually and as the Trustee
of THE E. MERMELSTEIN IRR TRUST A
designating Esther Fried as beneficiary and THE
E. MERMELSTEIN IRR TRUST A designating
Ariel Yabra as beneficiary, JOSEPH RUBIN,
JOSEPH RUBIN, INC.,

    Counterclaim Defendants.
-----------------------------------------------------------X

**OPINION & ORDER**
10-CV-5491-SJB

**BULSARA, United States Magistrate Judge:**

    On April 17, 2020, this Court concluded that in connection with the life insurance policy (the "Policy") for Eugene Mermelstein ("Mermelstein"), Joseph Rubin and his company Joseph Rubin, Inc. (collectively "Rubin") committed fraud. *Dukes Bridge, LLC v. Sec. Life of Denver Ins. Co.*, No. 10-CV-5491, 2020 WL 1908557, at *2, *63–64, *76–77 (E.D.N.Y. Apr. 17, 2020). That is, as an insurance agent, Rubin made material

misrepresentations to Security Life of Denver Insurance Company ("Security Life") to induce it to issue a $10 million insurance policy on Mermelstein's life. *Id.* at *63.

Notably, Rubin falsely represented the extent to which Mermelstein had applied for or had in force other insurance coverage. *Id.* at *55–57, *63. This misrepresentation was material because had Security Life known about the substantial other insurance Mermelstein had in force—three other policies worth $30 million—it would have declined to issue him yet another policy, to avoid "overinsuring" Mermelstein's life. *See id.* at *14, *17, *55. Not only did Rubin lie about Mermelstein's other life insurance once, he did so repeatedly, each time taking steps to foil Security Life's efforts to obtain the truth. *Id.* at *55 ("At first, [Mermelstein's] application did not answer the questions about other insurance. One month later, he provided an answer indicating 'no' other insurance had been applied for or was in force. . . . Rubin, on behalf of Mermelstein, gave another false statement via email: he told ING that Mermelstein . . . had applied for two other policies (with ANICO and Union Central), but he only intended to accept the best offer. Finally, Mermelstein submitted an application Amendment that contained the same falsehood." (citations omitted)), *63 ("Rubin also knew that Mermelstein had applied for other insurance policies because he was the agent on most of those policies and received commissions for them. . . . [H]e and his colleagues took steps to repeatedly lie to Security Life after it attempted to investigate the other insurance Mermelstein had in force. As his coup de grâce, Rubin forwarded the Amendment appended to the Policy for submission to ING. The Amendment, dated January 11, 2008, contained two false statements: that Mermelstein had only applied for insurance with ANICO and Union Central, and he would only accept the ING Policy." (citations and footnote omitted)).

Rubin also lied when asked in an "Agent's Report" whether his client Mermelstein would be using financing (like a loan) to pay for the nearly $1 million in yearly premiums. 2020 WL 1908557, at *19–21, *51–52, *63. He told Security Life no such financing would be used; in fact, Rubin was working with lenders who ultimately financed the premiums through a series of transactions intended to obscure their origin from Security Life. Id. at *63 ("[T]here is no doubt that Rubin knew that these representations were false and intended to defraud and mislead Security Life. Despite coordinating with Polter and Aqua Blue to obtain loans to finance Mermelstein's premiums, Rubin nonetheless claimed in the Agent's Report that no premium financing was being used. The Delaware Trust that was to take ownership of the Policy—and then transfer control of the Policy to the lender, Aqua Blue—was put in place by Miller before Rubin submitted his Agent's Report. Since Aqua Blue had no direct access to Mermelstein, the only way Aqua Blue and Miller would have known to establish that Trust was through Rubin's efforts to obtain financing."). Again, had Security Life known that Mermelstein intended to use premium loans, it would not have issued the Policy—its internal underwriting guidelines prohibited the use of such financing. Id. at *52–54, *75.

To top it off, Rubin lied and made incredulous statements in his deposition testimony in a futile attempt to deceive the Court and the parties about his wrongful conduct. Id. at *36 ("[Rubin's] deposition testimony is a master class in obfuscation."), *64 ("Rubin's deposition testimony . . . is wholly lacking in credibility. The phrases 'don't remember,' 'don't recall,' 'do not recall,' and 'don't recollect' appear 440 times in the 164-page transcript of Rubin's deposition. . . . It is quite obvious from viewing the video of the deposition that Rubin repeatedly made false statements during the

3

deposition about his lack of knowledge about substantial financial transactions that he personally orchestrated.  If anything, the deposition confirms that Rubin was continuing his pattern of lying, this time in litigation, to avoid the consequences of his fraud." (citations omitted)).  In sum, the record established that Rubin "indisputably" committed fraud.  *Id.* at *63.

The Court directed the parties to brief the issue of fraud damages.  2020 WL 1908557, at *77.  Both Security Life and Rubin made submissions.  (Security Life's Trial Br. in Supp. of Damages dated May 8, 2020 ("Security Life's Br."), Dkt. No. 288; Rubin's Post-Trial Br. on Damages dated June 9, 2020 ("Rubin's Resp."), Dkt. No. 294; Security Life's Reply in Supp. dated June 24, 2020, Dkt. No. 295).  No submission was made by any of the other parties.  The Court awards fraud damages to Security Life as detailed below.

New York law governs the fraud claim.  2020 WL 1908557, at *59.  Fraud damages should "compensate" parties "for what they lost because of the fraud."  *Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP*, 15 N.Y.3d 264, 271 (2010).  A victim may only recover the "actual pecuniary loss sustained as a direct result" of the fraud.  *Id.*  Where, like here, fraud induces a party to enter into a contract it otherwise would not have made, "the injury is the inducement to make a contract which otherwise would not have been made, and the measure of damages is indemnity for loss suffered through that inducement."  *Sager v. Friedman*, 270 N.Y. 472, 481 (1936); *see also In re AutoHop Litig.*, No. 12-CV-4155, 2014 WL 5591047, at *5 (S.D.N.Y. Nov. 4, 2014) ("The measure of damages for fraudulent inducement to make a contract that otherwise would not have been made 'is indemnity for loss suffered through that inducement.  From such damages all elements of profit are excluded.  The true measure of damage is indemnity for the

4

actual pecuniary loss sustained as a direct result of the wrong.'" (quoting *Sager,* 270 N.Y. at 481) (quotations omitted)).

There are four components to the fraud damages that Security Life seeks to recover: (1) commissions paid to Rubin and Bollinger by Security Life for procuring the Policy, in the amount of $1,046,760.00, (Security Life's Br. at 2–5); (2) attorney's fees incurred by Security Life, (*id.* at 5–12); (3) pre-judgment interest, (*id.* at 12–14); and (4) post-judgment interest, (*id.* at 14–15). Each is addressed in turn below.

1.  Commissions

Pursuant to their agreement, Security Life paid Rubin and Bollinger a total of $1,046,760.00 in commissions for procuring the Mermelstein Policy. *Dukes Bridge*, 2020 WL 1908557, at *25 ("ING paid Rubin $741,455 in commissions on the Policy, representing 85% of the Policy's target first year premium. ING paid Bollinger $305,305 in commissions, representing 35% of the Policy's target first year premium." (citations omitted)). Had Rubin not made the fraudulent misrepresentations to Security Life, it would not have issued the Policy, and Security Life would have never been obligated to pay these commissions. The commissions paid by Security Life were, therefore, actual and direct pecuniary losses suffered by Security Life. *See, e.g., La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, No. 06-CV-4404, 2014 WL 3610890, at *7 (S.D.N.Y. July 21, 2014) ("Kraus and Caruso . . . received a total of CHF 10,159,045.70 in commissions from their sale of marriage policies. Because 50% of those policies were sold in the United States, commissions paid to Kraus and Caruso for their sale of marriage policies in the United States total CHF 5,079,522.85. . . . The Court finds this methodology for calculating damages attributable to Kraus and Caruso to be reasonable . . . . [I]t does not seek damages for money lost on policies untainted by

5

Kraus and Caruso's fraud. Instead, it determines loss attributable to the policies Swiss Life issued at the behest of Kraus and Caruso. Accordingly, we find that Swiss Life suffered losses of CHF 45,399,522.85 as a result of Kraus and Caruso's fraudulent conduct."), *report and recommendation adopted*, 2014 U.S. Dist. LEXIS 108932 (Aug. 6, 2014).

Rubin makes a series of arguments in opposition; none have merit. Rubin argues that Security Life did not suffer actual damages because it received premiums from Mermelstein, which it used to pay the commissions to Rubin. (*See* Rubin's Resp. at 1, 10–11). This "netting" or "set off" argument is problematic in several respects. The "set off" rule typically applies in the context of a settlement by one party; a non-settling defendant may reduce its obligation by the amount paid by the settling defendant as to "common damages" owed to the plaintiff. *See Allstate Ins. Co. v. Yehudian*, No. 14-CV-4826, 2018 WL 1767873, at *18 (E.D.N.Y. Feb. 15, 2018), *report and recommendation adopted*, 2018 WL 1686106 (Mar. 31, 2018). A set-off in such a circumstance is appropriate because "a plaintiff is entitled to only one satisfaction for each injury." *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989) (collecting cases). Here, however, there are not "common damages." That is, Security Life obtained premiums from Mermelstein, which he used a loan to finance, *Dukes Bridge*, 2020 WL 1908557, at *19–26, *51–54, *70; those premiums were then used to pay Rubin's and Bollinger's commissions, harming Security Life, *id*. at *25, 63–64. There is no fraud finding against Mermelstein (or Dukes Bridge) for which Rubin is also being held liable. *See Dukes Bridge*, 2020 WL 1908557, at *71 ("Dukes Bridge is . . . not liable for fraud under any theory.").

Rubin's position is best understood as arguing that Security Life is not "out of pocket" the commissions, because they were paid from monies received from Mermelstein. To be sure, a victim is entitled only to her "out of pocket" losses arising from fraud. *Trans World Airlines, Inc. v. 47th St. Photo, Inc.*, No. 88-CV-1936, 1990 WL 481956, at *9 (S.D.N.Y. Apr. 16, 1990) ("In New York, a prevailing plaintiff in a fraud case is entitled to receive as compensation any actual out-of-pocket losses he incurred as a result of the fraud."). Here, however, Security Life was "out of pocket" the commissions paid to Rubin and Bollinger—had Security Life been aware of Rubin's fraud, it would not have paid the commissions. It may be that it also would have invalidated the Policy, and then been required to return the premiums to Mermelstein, but the two events were not inexorably tied. Indeed, this Court found that Security Life was entitled to retain the premiums it had received. *Dukes Bridge*, 2020 WL 1908557, *72–76 ("Security Life is equitably entitled to retain all premiums paid to it under the Policy."). That Rubin's commissions were paid traceable to the Policy premiums does not mean that Security Life did not suffer an out-of-pocket loss by paying him and Bollinger. No case or authority cited by Rubin compels a different result.[1] Quite the

---

[1] Likewise, there is no merit to the argument that Rubin should not be liable for the full amount of commissions paid to him because he himself took the commissions and paid others referral bonuses, (Rubin's Resp. at 11). *See Dukes Bridge*, 2020 WL 1908557, at *25 ("After the Policy was issued and the first-year premium was paid, a series of transactions reflecting referral fees and commission payments were consummated. First, ING paid commission fees to Rubin and Bollinger for acting as the writing and general agents on the policies. . . . Rubin paid $305,305 to Alpha Value in connection the financing of the Policy, the equivalent of 35% of the target premium. Rubin paid 'referral fees' in February and March in excess of $400,000 to 'Meron Associates.'"). The damages for fraud are determined by the victim's loss, not the net proceeds retained by the fraudster. *See, e.g.*, *Kraus*, 2014 WL 3610890, at *7 (awarding fraud damages to insurance underwriter-victim in gross amount of commissions paid out to fraudster-brokers).

opposite. *Cf. McDermott, Inc. v. AmClyde*, 511 U.S. 202, 219 (1994) ("The law contains no rigid rule against overcompensation. . . . [M]aking tortfeasors pay for the damage they cause can be more important than preventing overcompensation.").

Rubin also argues that Security Life did not prove reasonable reliance, causation, or that it exercised reasonable care, and that recovery is barred by the doctrine of *in pari delicto*. (Rubin's Resp. at 8–10). These arguments are not damages arguments; instead, they attempt to argue that Security Life has not established liability for fraud. The time to make such arguments passed long ago; to the extent Rubin wanted to dispute his fraud liability, he could and should have made such arguments in the extensive briefs submitted following trial. He chose not to, *see Dukes Bridge,* 2020 WL 1908557, at *64 ("Although Rubin was represented by separate counsel, his arguments largely mimic those made by Dukes Bridge, and he offers no independent defense to the fraud counterclaim; for example, for a reply submission, he simply filed the same brief as Dukes Bridge."); and in any event, the Court concluded that Security Life had demonstrated Rubin's liability, *id.* at *63 ("Rubin and Joseph Rubin, Inc. indisputably committed fraud." (footnote omitted)), *64 ("The Court finds Security Life has met its burden of proving Rubin, and Joseph Rubin, Inc., committed fraud and by clear and convincing evidence." (footnote omitted)). The briefing following the Court's entry of findings of fact and conclusions of law was to focus on damages and did not provide an opportunity to relitigate liability.

2. <u>Attorney's Fees</u>

Under the American Rule, a prevailing party is not entitled to attorney's fees incurred. *Mighty Midgets, Inc. v. Centennial Ins. Co.*, 47 N.Y.2d 12, 21–22 (1979) ("In contrast with other legal systems, such as that in Great Britain, it has now long been the

8

universal rule in this country not to allow a litigant to recover damages for the amounts expended in the successful prosecution or defense of its rights."). And, this is true when a victim prosecutes and prevails on a fraud claim. *See Highlands Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 27 F.3d 1027, 1034 (5th Cir. 1994) ("The New York rule is that counsel fees are incidents of litigation which a prevailing party may not collect unless an award is authorized by agreement between the parties, statute, or court rule. No general exception to the 'American Rule' exists for common law fraud." (footnotes omitted)) (citing *Cross v. Zyburo*, 185 A.D.2d 967, 968 (2d Dep't 1992)); *e.g.*, *In re Motel 6 Sec. Litig.*, No. 93-CV-2183, 2000 WL 322782, at *5–6 (S.D.N.Y. Mar. 28, 2000) ("Hirsh seeks to recover attorneys' fees and costs as an element of damages under his claim for common law fraud. . . . [I]t appears that under . . . New York . . . law the American Rule would preclude recovery of attorneys' fees.") (citing *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491 (1989)).

However, under New York law, "a fraud victim may recover attorney's fees . . . as out of pocket damages" from a fraudster when the fees are incurred defending a lawsuit brought by a third party. *Healing Power, Inc. v. Ace Cont'l Exports, Ltd.*, No. 07-CV-4175, 2008 WL 4693246, at *6 (E.D.N.Y. Oct. 17, 2008) (quotations omitted); *Kaleidoscope Media Grp., Inc. v. Entm't Sols., Inc.*, No. 97-CV-9369, 2001 WL 849532, at *4 (S.D.N.Y. July 19, 2001) ("[A]ttorney's fees may be recovered for fraud as out of pocket damages."). This exception applies when "if, through the wrongful act of his present adversary, a person is involved in earlier litigation with a third person in bringing or defending an action to protect his interests." *Shindler v. Lamb*, 25 Misc. 2d 810, 812 (Sup. Ct. 1959), *aff'd,* 10 A.D.2d 826 (1st Dep't 1960), *aff'd,* 9 N.Y.2d 621 (1961); *see also Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 309 (2d Cir. 1986)

9

("[U]nder New York law, where the litigation is caused by the wrongful act of a third party, the person is entitled to recover from the third party the reasonable value of attorneys' fees and other expenses thereby suffered or incurred." (quotations and alterations omitted)). "[I]t [is] simply stated as a general rule that an exception [is] applied when the defendant's tortious conduct required the victim to sue or defend against a third party." *Mut. Fire, Marine & Inland Ins. Co. v. Costa*, 789 F.2d 83, 89 (1st Cir. 1986).

Rubin misapprehends the requirement of litigation separateness—the requirement that fees be awarded only for earlier litigation with a third party. *See Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 741, 757 (S.D.N.Y. 2011) ("This narrow exception . . . applies only where the attorneys' fees and costs were incurred in a litigation prior to that in which the fees are sought as damages." (citations omitted)). He contends that Security Life cannot recover fees from defending against litigation brought by Dukes Bridge because they were incurred in the same litigation between Security Life and Rubin. (Rubin's Resp. at 12). Not so.

Cases awarding fees "involve circumstances where" the fraudster's "wrongful conduct" exposed the victim "to litigation with a third party" in which the fraudster "was not involved." *Goldberg*, 792 F.2d at 309. Without such separateness (*i.e.* the existence of a case involving a third party, not the fraudster), a victim recovers fees in situations that are anomalous or disfavored. For example, if the third party and the fraudster were the same party, the victim would be able to recover fees from defending against a claim brought by the fraudster, even though it could not recover fees for prevailing on the fraud claim. Despite the fact that the litigation involving the same subject matter between the same parties, the victim recovers fees in one case but not the other. (For

10

the litigation fees to constitute fraud damages, the fraud must causally relate to litigation the victim is forced to defend; that is why they necessarily involve the same subject matter). The result is illogical, and the exception would swallow the American Rule. To avoid such a result, the victim is only permitted to recover fees incurred from defending a third-party action, not one brought by the fraudster itself. *Hunt v. Sharp*, 85 N.Y.2d 883, 885–86 (1995) ("Whatever the proper scope of that exception, it is unavailable where, as here, the purported 'third-party' wrongdoer is, either legally or as a practical matter, *the same* as the claimant's opponent in the main action." (emphasis added)); *Coopers & Lybrand v. Levitt*, 52 A.D.2d 493, 496–97 (1st Dep't 1976) ("Lybrand asserts that these defendants instituted or prosecuted the three suits against it. However, this obviously is not an instance of litigation with a third party and Lybrand fails to demonstrate that it falls within the exception to the general rule.").

Or, if a fraudster and the victim were both sued together, as another example, a victim would be permitted to recover fees in defending against litigation brought by a third party, in which the fraudster is also a defendant. The fraudster "in such circumstances will in all probability bear the laboring oar in defending the claim," brought by the third party, and "other parties such as [the fraud victim] . . . are free to assert whatever claims they have against" the fraudster, "thereby disposing of all relevant claims in one action." *Goldberg*, 792 F.2d at 309. Requiring that the claim against the victim be separate from the claim against the fraudster avoids this result.

Neither circumstance is present here. Rubin—the fraudster—is not the third party that brought claims against Security Life; Dukes Bridge is. And although Rubin was in the litigation with Security Life, he was present not because of Dukes Bridge, but because of Security Life. Security Life brought Rubin in as a counterclaim-defendant,

11

and the two were always at odds. And the claims against Security Life are not as settled against Rubin. At no time was Rubin required to defend against claims brought by Dukes Bridge to enforce the Policy—Rubin had no occasion or incentive to defeat Dukes Bridge's entitlement to Policy proceeds. *See In re Refco Inc. Sec. Litig.*, No. 07-CV-8663, 2011 WL 13261982, at \*8 (S.D.N.Y. Apr. 11, 2011) ("There is no indication that THL was taking 'the laboring oar' in defending the claims in any of the cases in which the parties were joined." (quoting *Goldberg*, 792 F.2d at 309)), *special master report and recommendation adopted by reference*, Dkt. No. 241 (May 31, 2011).

As for Rubin's argument that the fraud counterclaim must be brought in a separate litigation, *i.e.* in a separately filed action, from the third-party action, that has never been the meaning of the separateness requirement. Indeed, such a requirement would make little sense—it would encourage the kind of claim or litigation-splitting that courts look upon with disdain. *See Vicinanzo v. Brunschwig & Fils, Inc.*, 739 F. Supp. 891, 895 (S.D.N.Y. 1990) ("New England responds by arguing that the exception invoked by B & F extends only to the recovery of legal fees expended in *separate lawsuits* with third parties. . . . We can conceive of no reason why New York law should be interpreted in this fashion. Why should B & F's right to recover legal fees from New England depend on whether plaintiffs have elected to bring two separate actions or a single consolidated suit? Any suggestion that B & F has let New England 'bear the laboring oar' in this litigation simply cannot be supported by the record in this case. Both B & F and New England have adopted litigation postures consistent with their adverse interests, and at no time has B & F been content to let New England carry the burden of defending against Mrs. Vicinanzo's claims." (quoting *Goldberg*, 792 F.2d at 309)); *see also Costa*, 789 F.2d at 89 ("[I]t is not necessary for the litigation against the

third party to have been separate from the litigation between the plaintiff and the defendant.").[2]

Because of Rubin's misrepresentations, Security Life issued a policy that absent his fraud, it would not have sold. *Dukes Bridge*, 2020 WL 1908557, at \*17 ("[H]ad [it] known the true state of Mermelstein's other life insurance, Security Life would not have issued the Policy."), \*19 ("Had Rubin indicated in the Agent's Report that the premiums were to be financed, the Policy would not have been issued."). It was then forced to defend against litigation brought by Dukes Bridge—a third party that initiated suit against Security Life as the result of Rubin's fraudulent conduct—to recover the proceeds on that Policy. Security Life is entitled to recover the fees it incurred in being forced to defend against the Policy fraudulently procured by Rubin. *E.g.*, *Ohio Nat'l Life Assur. Corp. v. Davis*, 803 F.3d 904, 910 (7th Cir. 2015) ("Of course generally the victorious party to a lawsuit can't charge his litigation expenses to the loser. But that is not what Ohio National is doing. It is seeking reimbursement of the expenses it has incurred in this litigation in order to avoid future litigation over the death benefits in the policies that it was fraudulently induced to issue.").

Security Life has provided invoices for the fees it incurred in the entirety of this litigation, a total of $2,183,161.50, of which it estimates $1,637,371.13 is attributable to defending against the litigation brought by Dukes Bridge to enforce the Policy (the remainder attributable to prosecuting the claims against Rubin). (Decl. of Elizabeth G. Doolin dated May 8, 2020, Dkt. No. 289 ¶ 7; Decl. of Kaitlyn E. Luther dated May 7,

---

[2] Even if the exception requires "earlier" or "prior" litigation, this case is safely within those bounds since Dukes Bridge triggered all litigation by filing suit against Security Life, and later, Security Life brought suit against Rubin.

13

2020 ("Luther Decl."), Dkt. No. 292 ¶¶ 5–7 & Ex. 1; Security Life's Br. at 12 & n.9). The Court has reviewed the billing rates used and finds them reasonable. (*See* Luther Decl. ¶ 9). Rubin does not dispute any of Security Life's calculations—including the billing rates, the allocation between the matters, or the time spent on the matters—and has waived any objection to them. (*See generally* Rubin's Resp.); *e.g.*, *Young Apartments, Inc. v. Town of Jupiter, Fla.*, No. 05-CV-80765, 2011 WL 13173808, at *2 (S.D. Fla. Oct. 13, 2011) ("[T]he Court finds that these rates are reasonable. Moreover, Plaintiff failed to lodge any objections to the reasonableness of the rates. Rather, Plaintiff's opposition improperly challenges Defendants' *entitlement* to fees. . . . [T]he Court has already decided the issue of entitlement. Plaintiff . . . waived its opportunity to argue the issue of reasonableness by failing to address this issue at all in its response to Defendants' memorandum."), *aff'd*, 503 F. App'x 711 (11th Cir. 2013); *Barclays Cap. Inc. v. Theflyonthewall.com*, No. 06-CV-4908, 2010 WL 2640095, at *3 (S.D.N.Y. June 30, 2010) ("[Defendant] does not object to the hourly billing rates requested by the . . . Plaintiffs for each of the eight attorneys who worked on this litigation between 2005 and 2010. According to the . . . Plaintiffs, the rates employed in their fee application reflect the standard, hourly rates that are generally charged to fee-paying clients subject to negotiated discounts, and are based on the amounts actually billed to the . . . Plaintiffs. Having reviewed the . . . Plaintiffs' fee application, the Court agrees that the hourly rates appear reasonable." (quotations and alteration omitted)).

14

The Court awards Security Life $1,637,371.13 in attorney's fees.[3]  *See, e.g.*, *AMC Film Holdings LLC v. Rosenberg*, No. 03-CV-3835, 2006 WL 2827860, at *5–6 (E.D.N.Y. Sept. 29, 2006) ("A plaintiff seeking damages based on fraud is entitled to recover its 'out-of-pocket' expenses. . . . [A]ttorney's fees may be recovered for fraud as out of pocket damages. . . . In support of this particular claim, TV Matters has submitted contemporaneous attorney time records detailing the dates counsel worked, the hours expended, and what type of work counsel performed.  The Court finds that this showing suffices to justify such an award and, accordingly, this portion of TV Matters's request is approved." (citations and quotations omitted)).

3. <u>Pre- and Post-Judgment Interest</u>

Security Life is entitled to pre-judgment interest on its fraud damages.  *See* N.Y. C.P.L.R. § 5001(a); *Gov't Emps. Ins. Co. v. Parkway Med. Care, P.C.*, No. 15-CV-3670, 2017 WL 1133282, at *17 (E.D.N.Y. Feb. 21, 2017) ("Under New York law, an award of pre-judgment interest on damages awarded for fraud is mandatory."), *report and recommendation adopted*, 2017 WL 1131901 (Mar. 24, 2017); *see also Flamm v. Noble*, 296 N.Y. 262, 268 (1947) (holding that "plaintiff is in either event," whether labelled a case of "duress rather than one for fraud," "entitled as matter of law to a recovery of the interest now demanded by him" under New York law).  "New York law provides for prejudgment interest on fraud claims, and dictates that '[i]nterest shall be computed

---

[3] Security Life also does not seek attorney's fees incurred by prior counsel. (Security Life's Br. at 5 n.5 ("Security Life also incurred attorneys' fees from approximately December 2010 through April 2014 related to the representation of prior counsel.  On April 28, 2014, current counsel filed its Consent Order Granting Substitution of Counsel. ([Notice of Consent to Change Attorney dated Apr. 28, 2014, Dkt.] No. 93).  Security Life is not pursuing attorneys' fees charged by prior counsel; rather, it only requests fees related to its current counsel from March 19, 2014 through April 19, 2020.")).

15

from the earliest ascertainable date the cause of action existed.'" *Allstate Ins. Co. v. Abramov*, No. 16-CV-1465, 2020 WL 1172697, at *15 (E.D.N.Y. Feb. 21, 2020) (quoting N.Y. C.P.L.R. § 5001(b)), *report and recommendation adopted*, 2020 WL 1166498 (Mar. 11, 2020). The interest is calculated at the non-compoundable rate of 9% per year. N.Y. C.P.L.R. § 5004; *Allstate Ins. Co. v. A & F Med. P.C.*, No. 14-CV-6756, 2019 WL 7842516, at *7 (E.D.N.Y. Sept. 11, 2019) ("New York law provides for the award of prejudgment interest on damages for fraud, computed from the earliest ascertainable date the cause of action existed at the non-compoundable rate of nine percent (9%) per annum. An award of interest on damages for fraud is mandatory under New York law." (citations and quotations omitted)), *report and recommendation adopted*, 2020 WL 132387 (Jan. 13, 2020). Rubin does not dispute the entitlement to this interest. (*See generally* Rubin's Resp.).

For the commission payments, a total of $1,046,760.00, the interest should be calculated from January 29, 2008, and through July 20, 2020, which amounts to $1,175,927.32. The beginning date is January 29, 2008, based upon the first payment of commissions to Rubin, *Dukes Bridge*, 2020 WL 1908557, at *25 ("On or about January

16

29, 2008, ING paid Rubin $741,455 in commissions on the Policy.").[4] *See, e.g., Mount Sinai Hosp. v. Borg-Warner Corp.*, 527 F. Supp. 922, 926 (S.D.N.Y. 1981) ("[I]nterest in this case is to start from the date plaintiffs suffered pecuniary damage . . . . Here, the pecuniary damage occurred when plaintiffs were deprived of the use of their money on the respective dates they made payments to the defendant. . . . Accordingly, the judgment shall include prejudgment interest from the date each payment was made to the date of entry of judgment."); *Demms v. Blanchard*, 150 Misc. 867, 869 (Sup. Ct. 1934) ("As Judge Cardozo said . . . 'One marks a growing tendency to make interest an incident where it might once have been excluded.' Interest should be added from August 15, 1929, the date when the plaintiff parted with the $5,000, which the jury awarded to the plaintiff." (quoting *Prager v. N.J. Fid. & Plate Glass Ins. Co. of Newark, N.J.*, 245 N.Y. 1, 7 (1927)). Thereafter, interest is awarded at a daily rate of $258.11.[5]

---

[4] Security Life bases its pre-judgment interest calculation for the commission damages on a starting date of January 1, 2009, instead of the date of the actual payment, because "[c]ourts in the Eastern District of New York have found this method of choosing an accrual date of January 1st of the year following the year in which payments were made to be conservative and reasonable." (Security Life's Br. at 14 n.11). But only one case cited by Security Life uses a January 1 date, and in that case, the court was not stating a general rule, but rather describing how in that case those plaintiffs had simplified calculations for multiple payments. *See A & F Med. P.C.*, 2019 WL 7842516, at *8 & n.6. Where, as here, there is one payment for which interest is accruing, the date to be used is the date of payment. *See, e.g., Sole v. Knoedler Gallery, LLC*, No. 12-CV-2313, 2016 WL 5417880, at *9 (S.D.N.Y. July 21, 2016) ("Plaintiffs' fraud-based claims 'existed' on December 17, 2004 when they paid for the forged Work based on the misrepresentations alleged in the SAC.") (collecting cases), *report and recommendation adopted*, 2016 WL 5468298 (Sept. 28, 2016).

[5] Using a 9% interest rate on a principal amount of $1,046,760.00, amounts to $258.11 per day, rounded, and over the period January 29, 2008, through July 20, 2020 (a total of 4556 days), amounts to total pre-judgment interest on commissions as of July 20, 2020 of $1,175,927.32.

17

For the attorney fee's incurred defending against Dukes Bridge, a total of $1,637,371.13, the interest should be calculated from May 6, 2017, and through July 20, 2020, and amounts to $472,774.09. Where damages for which interest accrues were "incurred at various times, interest shall be computed . . . from a single reasonable intermediate date." *Coulibaly v. Millennium Super Car Wash, Inc.*, No. 12-CV-4760, 2013 WL 6021668, at *15 (E.D.N.Y. Nov. 13, 2013) (quoting N.Y. C.P.L.R. § 5001(b) (alteration omitted)). "Courts have discretion in choosing a reasonable date from which to calculate pre-judgment interest. A common date is '[t]he median date between the earliest ascertainable date the cause of action existed and the date the action was filed[.]'" *Lopez v. Royal Thai Plus, LLC*, No. 16-CV-4028, 2018 WL 1770660, at *12 (E.D.N.Y. Feb. 6, 2018) (quoting *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 93 (E.D.N.Y. 2012)) (citation omitted), *report and recommendation adopted*, 2018 WL 1770555 (Apr. 12, 2018). The beginning date here is May 6, 2017, the midpoint between March 19, 2014, when Security Life's current counsel's started accruing fees in defending against Dukes Bridge's claims, and June 24, 2020, the filing of Security Life's filing of its reply brief on damages.[6]

---

[6] Security Life does not use a midpoint calculation, instead using the date when current counsel started accruing fees. (Security Life's Br. at 13). As explained, where interest is accruing on amounts incurred at different times, using a midpoint date is the reasonable approach. *See Coulibaly*, 2013 WL 6021668, at *15.

18

Thereafter, interest is awarded at a daily rate of $403.74.[7] *See, e.g., Healing Power, Inc. v. Ace Cont'l Exports, Ltd.*, No. 07-CV-4175, 2008 WL 4693246, at *9 (E.D.N.Y. Oct. 17, 2008) ("Prejudgment interest accrues on a simple interest basis at a rate of nine percent per year until entry of a final judgment. Here, interest should be calculated on the total amount of damages plaintiff is to be awarded for the fraud, including . . . attorneys fees[.]" (citations omitted)).

Security Life is also entitled to post-judgment interest. 28 U.S.C. § 1961. Rubin also does not dispute this entitlement. (*See generally* Rubin's Resp.).

## CONCLUSION

Security Life is therefore entitled to the following as fraud damages from Rubin:

- $1,046,760.00, the amount of commissions it paid out on the Policy;

- $1,637,371.13, the amount it expended in attorney's fees defending against Dukes Bridge;

- Pre-judgment interest of $1,648,701.41 and $661.85 per day from July 20, 2020, through the date judgment is entered; and

- Post-judgment interest pursuant to 28 U.S.C. § 1961.

---

[7] Using a 9% interest rate on a principal amount of $1,637,371.13, amounts to $403.74 per day, rounded, and over the period May 6, 2017, through July 20, 2020 (a total of 1171 days), amounts to total pre-judgment interest on attorney's fees as of July 20, 2020 of $472,774.09 and with the commissions interest, a combined daily rate of $661.85 and total of $1,648,701.41.

Because of the daily interest awarded through judgment for commissions and attorney's fees damages, and the Court's explanation of the interest calculations, Security Life's request to update its interest calculations, (Security Life's Br. at 14), is denied.

19

Security Life should submit a proposed judgment to the Clerk of Court by July 27, 2020.

After entry of Judgment, the Clerk of Court is directed to close this case.

                                                  SO ORDERED.

                                                  */s/ Sanket J. Bulsara* July 20, 2020
                                                  SANKET J. BULSARA
                                                  United States Magistrate Judge

Brooklyn, New York